**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| SEAN DEVERS, derivatively on behalf of CROWN CASTLE INTERNATIONAL CORP., | |
| Plaintiff, | Case No.: |
| vs. | |
| JAY A. BROWN, DANIEL K. SCHLANGER, P. ROBERT BARTOLO, CINDY CHRISTY, ARI Q. FITZGERALD, ROBERT E. GARRISON II, ANDREA J. GOLDSMITH, LEE W. HOGAN, EDWARD C. HUTCHESON, JR., J. LANDIS MARTIN, ROBERT F. MCKENZIE, ANTHONY J. MELONE, and W. BENJAMIN MORELAND, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| CROWN CASTLE INTERNATIONAL CORP., | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

### INTRODUCTION

Plaintiff Sean Devers ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Crown Castle International Corp. ("Crown Castle" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Jay A. Brown, Daniel K. Schlanger, P. Robert Bartolo, Cindy Christy, Ari Q. Fitzgerald, Robert E. Garrison II, Andrea J. Goldsmith, Lee W. Hogan, Edward C. Hutcheson, Jr., J. Landis Martin, Robert F. McKenzie, Anthony J. Melone, and W. Benjamin Moreland (collectively, the "Individual Defendants" and together with Crown Castle, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Crown Castle, for violations of Section 14(a) of the Securities

1

Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiff's attorneys, which included a review of Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, conference call transcripts, securities analysts' reports about the Company, legal filings, news reports, and information publicly available on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action seeking to redress wrongdoing committed by certain of Crown Castle's officers and directors from February 26, 2018 through February 26, 2020 (the "Relevant Period"), which has caused substantial damage to the Company.

2.      Crown Castle is a Texas-based real estate investment trust ("REIT") operating in the communications infrastructure sector. Specifically, Crown Castle owns, operates, and leases roughly 40,000 cell towers and over 65,000 miles of fiber optic cable across the United States.

3.      As a publicly traded company, Crown Castle is required by applicable SEC rules to prepare and file financial statements that comply with generally accepted accounting principles ("GAAP"). Non-complaint financial statements are generally presumed to be misleading by the SEC.

4.      From at least February 26, 2018 through November 4, 2019, the Individual Defendants caused the Company to improperly record certain revenues in the Company's financial statements. Specifically, the Company recorded the entirety of the transaction price from cell tower

2

installation services as revenue upon the completion of such services, despite the fact that portions of these transaction prices constituted modifications to leases. Pursuant to GAAP, such revenues should have been recognized over the course of the lease terms, rather than all at once. As such, all of Crown Castle's financial statements issued from February 26, 2018 through November 4, 2019, at least, were not prepared in accordance with GAAP.

5.      As the Individual Defendants would later reveal, in September 2019, the SEC issued a subpoena to the Company requesting documents relating to Crown Castle's expense policies in its service business. Following receipt of the subpoena, the Company and its independent auditor discussed the Company's revenue recognition policies with the SEC's Office of the Chief Accountant (the "OCA").

6.      The truth emerged on February 26, 2020, when the Company issued a press release revealing that the OCA and the Company had decided that the Company's revenue recognition practices with respect to cell tower installation services revenue was in violation of GAAP. As the Individual Defendants conceded, these revelations indicated the existence of a material weakness in the Company's internal controls, and moreover, the Company would be required to reduce its adjusted earnings before interest, tax, depreciation, and amortization ("EBITDA"), its adjusted funds from operations, and its net income for the fiscal year ended December 31, 2019 by roughly $100 million, each.

7.      Additionally, the Individual Defendants disclosed that the Company would be forced to restate each of the financial statements contained in the Company's annual and periodic reports filed with the SEC during 2018 and 2019.

8.     On this news, the Company's stock price plummeted by approximately 8.8%, falling from $162.69 per share at closing on February 26, 2020, to $148.40 per share at closing on February 27, 2020.

9.     On March 2, 2020, the Company notified the SEC that due to the material weaknesses in the Company's internal controls, the Company would be unable to timely file its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K").

10.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices, and by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain revenue pertaining to its cell tower installation services in its financial statements; (2) as such, the Company's financial statements filed with the SEC were not prepared in accordance with GAAP; (3) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (4) the Company failed to maintain effective disclosure controls and procedures and internal controls over financial reporting; (5) as a result of the foregoing, the Company would be subjected to an SEC investigation, and would ultimately be forced to restate its annual reports for the fiscal years ended December 31, 2018 and December 31, 2017, as well as each of its periodic reports issued during 2018 and 2019; and (6) due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

11.     Also in breach of their fiduciary duties, The Individual Defendants failed to correct and/or caused the Company to fail to correct the foregoing false and misleading statements and omissions, while one of the Individual Defendants engaged in insider trading, receiving proceeds of approximately $279,311.

12.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain and adequate system of oversight, disclosure controls and procedures, and internal controls, and caused the Company to fail to timely file its 2019 10-K.

13.     The Individual Defendants' misconduct and breaches of fiduciary duty have caused the Company, along with its Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), to be named as defendants in two federal securities fraud class action lawsuits pending in the United States District Court for the District of New Jersey (the "Securities Class Actions"). Additionally, the Company has been subjected to the need to undertake internal investigations, losses due to the unjust enrichment of the Individual Defendants who were over-compensated by the Company given their misconduct, and losses due to the waste of corporate assets, all of which will cost the Company going forward millions of dollars.

14.     Considering the breaches of fiduciary duty engaged in by the Individual Defendants, all but one of whom currently serve as Company directors,  the directors' collective engagement in fraud and misconduct, the strong likelihood of the directors' liability in this derivative action and the Company's CEO's liability in the Securities Class Actions, and in light of the directors not being disinterested and/or independent, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act, 15. U.S.C. § 78j(b), and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f).

16.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

17.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.    Venue is proper in this District because Crown Castle is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### *Plaintiff*

19.    Plaintiff is a current shareholder of Crown Castle and has continuously held Crown Castle common stock at all relevant times.

### *Nominal Defendant Crown Castle*

20.    Crown Castle is a Delaware corporation, with its headquarters located at 1220 Augusta Drive, Suite 600, Houston, Texas 77057-2261. Crown Castle's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CCI."

### *Defendant Brown*

21.    Defendant Jay A. Brown ("Brown") is the Company's current CEO and President, and has served in those roles since June 2016. Between July 2008 and May 2016, he served as the

6

Company's Senior Vice President, CFO, and Treasurer. The Company's Schedule 14A filed with the SEC on March 30, 2020 (the "2020 Proxy Statement) described Defendant Brown as follows:

> Mr. Brown was elected to the Board as a director in May 2016 and has served as our President and CEO effective June 2016.  Previously, Mr. Brown served as our Senior Vice President ("SVP"), Chief Financial Officer ("CFO") and Treasurer from July 2008 to May 2016.  Mr. Brown served as Vice President of Finance from August 2001 until his appointment as our CFO and, during such time, was also appointed Treasurer in May 2004.  From the time he joined the Company in August 1999 until July 2001, Mr. Brown served in a number of positions in corporate development and corporate finance.  Mr. Brown serves on the advisory board of governors of NAREIT—the National Association of Real Estate Investment Trusts, the board of directors and executive committee of the Wireless Industry Association and the advisory board of Hankamer School of Business at Baylor University.

22.     According to the 2020 Proxy Statement, Defendant Brown was the beneficial owner of 268,855 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Brown owned approximately $36.8 million worth of Company stock.

23.     Defendant Brown received $9,025,526 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $905,769 in salary, $6,361,135 in stock awards, $1,707,772 in non-equity incentive plan compensation, and $50,850 in all other compensation.

24.     Defendant Brown received $12,620,843 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $985,577 in salary, $9,465,217 in stock awards, $2,119,541 in non-equity incentive plan compensation, and $50,508 in all other compensation.

*Defendant Schlanger*

25.     Defendant Daniel K. Schlanger ("Schlanger") is the Company's current Senior Vice President and CFO, and has served in those roles since June 2016. The 2020 Proxy Statement described Defendant Schlanger as follows:

> Daniel K. Schlanger was appointed our SVP and CFO, effective June 1, 2016, after joining the Company as SVP—Finance effective April 1, 2016. In addition, Mr. Schlanger served as our Treasurer from October 23, 2017 to December 11, 2018. Mr. Schlanger previously served as SVP and CFO of Exterran GP LLC, the general partner of Exterran Partners, L.P., from June 2006 through March 2009 and as a director of Exterran GP LLC's board of directors from October 2006 through November 2015. From October 2015 to March 2016, Mr. Schlanger served as SVP of Global Products at Exterran Corporation, an oil and gas products and services company, where he was responsible for global product strategy development and implementation. From 2009 to 2015, Mr. Schlanger also served as SVP in various capacities, including marketing and operations, with Exterran Holdings, Inc. and Exterran GP LLC. Prior to working with Exterran Partners, L.P. and Exterran Corporation, Mr. Schlanger was employed as an investment banker with Merrill Lynch & Co., where he focused on mergers and acquisitions and capital markets transactions in the energy sector.

26.     According to the 2020 Proxy Statement, Defendant Schlanger was the beneficial owner of 38,162 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Schlanger owned approximately $8.47 million worth of Company stock.

27.     Defendant Schlanger received 3,357,955 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $527,519 in salary, $2,167,442 in stock awards, $612,144 in non-equity incentive plan compensation, and $50,850 in all other compensation.

28.     Defendant Schlanger received 4,281,308 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $5624,404 in salary,

$2,957,727 in stock awards, $710,669 in non-equity incentive plan compensation, and $50,508 in all other compensation.

### Defendant Bartolo

29.     Defendant P. Robert Bartolo ("Bartolo") is a Company director, and has served in that capacity since February 2014. He also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee. The 2020 Proxy Statement described Defendant Bartolo as follows:

> Mr. Bartolo was appointed to the Board as a director in February 2014. Mr. Bartolo served as a portfolio manager in the U.S. Equity Division of T. Rowe Price from March 2005 to January 2014. During such time, Mr. Bartolo also served as Vice President of T. Rowe Price Group, Inc. From October 2007 to January 2014, Mr. Bartolo served as Executive Vice President ("EVP") of the U.S. Growth Stock Fund and chairman of that fund's Investment Advisory Committee. Mr. Bartolo also analyzed and recommended companies in the telecommunications and related industries for T. Rowe Price from August 2002 to March 2007 and co-managed the Media and Telecom Fund from March 2005 to March 2007. Mr. Bartolo has earned the Chartered Financial Analyst designation.

30.     According to the 2020 Proxy Statement, Defendant Bartolo was the beneficial owner of 29,814 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Bartolo owned approximately $4.08 million worth of Company stock.

31.     Defendant Bartolo received $272,339 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $95,000 in fees earned or paid in cash, $154,952 in stock awards, and $22,387 in all other compensation.

32.     Defendant Bartolo received $321,540 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $120,000 in fees earned or paid in cash, $179,995 in stock awards, and $21,545 in all other compensation.

### Defendant Christy

33.     Defendant Cindy Christy ("Christy") is a Company director, and has served in that capacity since August 2007. She also serves as the Chair of the Compensation Committee, and as a member of the Nominating & Corporate Governance Committee. The 2020 Proxy Statement described Defendant Christy as follows:

> Ms. Christy was appointed to the Board as a director in August 2007. Ms. Christy has served as President of Asurion Corporation ("Asurion") since September 2014. Ms. Christy's prior positions at Asurion include service as Chief Operating Officer ("COO") from September 2014 to December 2017, as President-Americas from December 2012 to September 2014, and as President-Sales, Marketing and Product Management from November 2008 to December 2012. Prior to joining Asurion, Ms. Christy served as President, Americas Region for Alcatel-Lucent from January 2008 to September 2008 and as President of the North America Region for Alcatel-Lucent from December 2006 to December 2007. Prior to that time, Ms. Christy served in various positions with Lucent Technologies Inc., including President of the Network Solutions Group, President of the Mobility Solutions Group and COO of the Mobility Solutions Group. From August 2015 to February 2019, Ms. Christy served on the board of directors of The Dun & Bradstreet Corporation, formerly a public company.

34.     According to the 2020 Proxy Statement, Defendant Christy was the beneficial owner of 28,009 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Christy owned approximately $3.83 million worth of Company stock.

35.     Defendant Christy received $244,952 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $90,000 in fees earned or paid in cash and $154,952 in stock awards.

36.     Defendant Christy received $284,995 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $105,000 in fees earned or paid in cash and $179,995 in stock awards.

**Defendant Fitzgerald**

37.     Defendant Ari Q. Fitzgerald ("Fitzgerald") is a Company director, and has served in that capacity since August 2002. He also serves as the Chair of the Nominating & Corporate Governance Committee, and as a member of the Compensation Committee and the Strategy Committee. The 2020 Proxy Statement described Defendant Fitzgerald as follows:

> Mr. Fitzgerald was appointed to the Board as a director in August 2002. Mr. Fitzgerald is currently a partner in the Washington, D.C. office of Hogan Lovells US LLP ("Hogan Lovells"), and is a member of that firm's Communications Group, where he concentrates on wireless, international and Internet-related issues. Prior to joining Hogan Lovells, Mr. Fitzgerald was an attorney with the Federal Communications Commission ("FCC") from 1997 to 2001. While at the FCC, he served for nearly three years as legal advisor to FCC Chairman William Kennard and later as Deputy Chief of the FCC's International Bureau. Prior to joining the FCC, Mr. Fitzgerald was an attorney in the Office of Legal Counsel of the U.S. Department of Justice. He also served as legal counsel to former U.S. Senator Bill Bradley. Prior to working for the U.S. Department of Justice, Mr. Fitzgerald worked as an attorney for the law firm of Sullivan & Cromwell LLP.

38.     According to the 2020 Proxy Statement, Defendant Fitzgerald was the beneficial owner of 29,539 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Fitzgerald owned approximately $4.04 million worth of Company stock.

39.     Defendant Fitzgerald received $239,952 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $85,000 in fees earned or paid in cash and $154,952 in stock awards.

40.     Defendant Fitzgerald received $284,995 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $105,000 in fees earned or paid in cash and $179,995 in stock awards.

*Defendant Garrison*

41.     Defendant Robert E. Garrison II ("Garrison") is a Company director, and has served in that capacity since May 2005. He also serves as a member of the Compensation Committee and the Audit Committee. The 2020 Proxy Statement described Defendant Garrison as follows:

> Mr. Garrison was elected to the Board as a director in May 2005. Mr. Garrison served as Chairman of the Executive Committee of Sanders Morris Harris Group Inc. ("SMHG"), a financial services company, from May 2009 until February 2012. Mr. Garrison served as President and CEO of SMHG from January 1999 until May 2002 and as President until May 2009. Mr. Garrison is a director of Prosperity Bank; NuPhysicia LLC; and JTS Capital Corp, each a private company. He also serves as a corporate member of the board of directors of the Memorial Hermann Health System. Mr. Garrison has had prior service as a director of FirstCity Financial Corporation and SMHG (each, formerly a public company). Mr. Garrison has over 40 years' experience in the securities industry and is a Chartered Financial Analyst.

42.     According to the 2020 Proxy Statement, Defendant Garrison was the beneficial owner of 27,685 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Garrison owned approximately $3.78 million worth of Company stock.

43.     Defendant Garrison received $254,346 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $80,000 in fees earned or paid in cash, $154,952 in stock awards, and $19,394 in all other compensation.

44.     Defendant Garrison received $302,762 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $110,000 in fees earned or paid in cash, $179,995 in stock awards, and $12,767 in all other compensation.

45.     During the period when the Company materially misstated information to the investing public to keep the price of the Company's stock artificially inflated, and before the scheme was exposed, Defendant Garrison made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 8/29/2018 | 2,451 | $113.96 | $279,311 |

46.     Defendant Garrison's insider sale, which was made with knowledge of material non-public information, demonstrates his motive in facilitating and participating in the scheme.

### Defendant Goldsmith

47.     Defendant Andrea J. Goldsmith ("Goldsmith") is a Company director, and has served in that capacity since February 2018. She also serves as a member of the Nominating & Corporate Governance Committee and the Strategy Committee. The 2020 Proxy Statement described Defendant Goldsmith as follows:

> Ms. Goldsmith was appointed to the Board effective February 2018. Ms. Goldsmith has served as the Stephen Harris professor in the School of Engineering at Stanford University since 2012 and has served as a professor, associate professor or assistant professor at Stanford University since January 1999. Ms. Goldsmith also founded and served as Chief Technology Officer ("CTO") of Plume WiFi (formerly, Accelera, Inc.) from August 2010 to August 2014 and Quantenna Communications, Inc. (formerly, mySource Communications, Inc.) from 2005 to 2009. In addition, Ms. Goldsmith currently serves on the Technical Advisory Boards of Sequans Communications and Cohere Technologies. Ms. Goldsmith is a frequent lecturer and writer regarding wireless technologies. Ms. Goldsmith also serves on the board of directors of Medtronic plc, a public company.

48.     According to the 2020 Proxy Statement, Defendant Goldsmith was the beneficial owner of 4,054 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Goldsmith owned approximately $554,952 worth of Company stock.

49.     Defendant Goldsmith received $229,952 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $75,000 in fees earned or paid in cash and $154,952 in stock awards.

50.    Defendant Goldsmith received $284,995 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $85,000 in fees earned or paid in cash and $179,995 in stock awards.

### Defendant Hogan

51.    Defendant Lee W. Hogan ("Hogan") is a Company director, and has served in that capacity since March 2001. He also serves as a member of the Audit Committee, the Compensation Committee, and the Strategy Committee. The 2020 Proxy Statement described Defendant Hogan as follows:

> Mr. Hogan was appointed to the Board as a director in March 2001. Mr. Hogan served as President and CEO of SFM Limited from March 2001 to December 2001. Mr. Hogan served as an officer and director of Reliant Energy Inc. ("Reliant"), a public diversified international energy services and energy delivery company, from 1990 to 2000. During his tenure at Reliant, Mr. Hogan served as Vice Chairman and as one of four members of The Office of the CEO, the principal management policy instrument of Reliant. In addition, he served on the Finance Committee of Reliant's board of directors. Previously, Mr. Hogan served as CEO of Reliant's Retail Energy Group, president and CEO of Reliant's International Business Group (directing energy operations in Asia, Europe and Latin America), and in a variety of capacities for Reliant's Houston Lighting & Power subsidiary. Mr. Hogan was the founding president of The Greater Houston Partnership, a business advocacy organization, where he served from 1987 to 1990.

52.    According to the 2020 Proxy Statement, Defendant Hogan was the beneficial owner of 52,134 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Hogan owned approximately $7.13 million worth of Company stock.

53.    Defendant Hogan received $234,952 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $80,000 in fees earned or paid in cash and $154,952 in stock awards.

54.     Defendant Hogan received $289,995 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $110,000 in fees earned or paid in cash and $179,995 in stock awards.

### Defendant Hutcheson

55.     Defendant Edward C. Hutcheson, Jr. ("Hutcheson") is a Company director, and has served in that capacity from January 1995 until February 1999, and from July 1999 to the present. He also serves as a member of the Strategy Committee. The 2020 Proxy Statement described Defendant Hutcheson as follows:

> Mr. Hutcheson has served on the Board as a director from January 1995 until February 1999 and from July 1999 to the present. Mr. Hutcheson was a co-founder of ours in 1994 and served as our CEO or Chairman from inception until March 1997. Since February 2000, Mr. Hutcheson has been involved in private investment and consulting activities. He currently serves as a Managing Director and Senior Advisor of the private equity firm Platte River Equity, LLC. From March 1997 until February 2000, he served in several capacities, including COO, with Pinnacle Global Group Inc., formerly a public financial services company, which merged to form SMHG. From 1987 through 1993, he served in senior management roles with Baroid Corporation, formerly a public petroleum services company and now a part of Halliburton Co. He served as President, COO and a director of the Baroid holding company from 1990 through 1993. Mr. Hutcheson is also a member of the Board of Trustees of Northwestern University.

56.     According to the 2020 Proxy Statement, Defendant Hutcheson was the beneficial owner of 62,222 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Hutcheson owned approximately $8.51 million worth of Company stock.

57.     Defendant Hutcheson received $249,346 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $75,000 in fees earned or paid in cash, $154,952 in stock awards, and $19,394 in all other compensation.

58.     Defendant Hutcheson received $277,762 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $85,000 in fees earned or paid in cash, $179,995 in stock awards, and $12,767 in all other compensation.

### *Defendant Martin*

59.     Defendant J. Landis Martin ("Martin") is a Company director, and has served in that capacity from 1995 until November 1998, and from November 1999 to the present. He has also served as the Chairman of the Board since May 2002. Additionally, Defendant Martin serves as a member of the Nominating & Corporate Governance Committee. The 2020 Proxy Statement described Defendant Martin as follows:

> Mr. Martin has been a director on our Board from 1995 through November 1998 and from November 1999 to the present. Mr. Martin has served as Chairman of our Board since May 2002. Mr. Martin is Chairman of the private equity firm Platte River Equity, LLC and has been a Managing Director since its founding in November 2005. Mr. Martin retired as Chairman and CEO of Titanium Metals Corporation, a public integrated producer of titanium metals company, where he served from January 1994 until November 2005. Mr. Martin served as President and CEO of NL Industries, Inc., a public chemical manufacturing company, from 1987 to 2003 and as a director from 1986 to 2003. Mr. Martin is also lead director of Apartment Investment Management Company and Intrepid Potash, Inc., each a public company. Mr. Martin served as a director on the board of directors of Halliburton Company, a public company, from 1998 until 2018, having served as lead director from 2009 to 2018.

60.     According to the 2020 Proxy Statement, Defendant Martin was the beneficial owner of 165,193 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Martin owned over $22.6 million worth of Company stock.

61.     Defendant Martin received $329,908 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $75,000 in fees earned or paid in cash and $254,908 in stock awards.

62.     Defendant Martin received $364,899 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $85,000 in fees earned or paid in cash and $279,899 in stock awards.

### Defendant McKenzie

63.     Defendant Robert F. McKenzie ("McKenzie") is a Company director, and has served in that capacity since 1995. He also serves as a member of the Audit Committee and the Strategy Committee. The 2020 Proxy Statement described Defendant McKenzie as follows:

> Mr. McKenzie was elected to the Board as a director in 1995. During his multi-decade career, Mr. McKenzie built and led operations of mobile wireless, voice and data networking, computer storage, and business services companies. From 1990 to 1994, Mr. McKenzie was a founder, director and President/COO of OneComm, Inc., a mobile communications provider, which was sold to Nextel Communications (now part of Sprint Corporation) ("Nextel") in 1994. From 1980 to 1990, he held general management positions with Northern Telecom, Inc. and was responsible for the marketing and support of its Meridian Telephone Systems and Distributed Communications networks to businesses in the Western United States. In addition, as an independent investor and director, he has helped establish Vector ESP, Inc. (a private company implementing server-based computing applications), CO Space Inc. (a private computer server co-location facilities company), Velocom, Inc. (a private company providing wireless telephone and Internet services in Brazil), and Cordillera Communications Corporation (a private mobile communications provider in the U.S., Peru, Ecuador and Chile). From June 2012 to December 2015, Mr. McKenzie served on the board of directors of Mobile Pulse Inc. (a private mobile connectivity analytics company).

64.     According to the 2020 Proxy Statement, Defendant McKenzie was the beneficial owner of 32,912 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant McKenzie owned approximately $4.5 million worth of Company stock.

65.     Defendant McKenzie received $254,346 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $80,000 in fees earned or paid in cash, $154,952 in stock awards, and $19,394 in all other compensation.

66.     Defendant McKenzie received $292,762 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $100,000 in fees earned or paid in cash, $179,995 in stock awards, and $12,767 in all other compensation.

**Defendant Melone**

67.     Defendant Anthony J. Melone ("Melone") is a Company director, and has served in that capacity since May 2015. He also serves as the Chair of the Strategy Committee, and as a member of the Nominating & Corporate Governance Committee. The 2020 Proxy Statement described Defendant Melone as follows:

> Mr. Melone was appointed to the Board as a director in May 2015. Mr. Melone has over three decades of experience in the telecommunications industry, including having served as EVP and CTO for Verizon Communications from December 2010 to April 2015. In addition, Mr. Melone served in a variety of positions with Verizon Wireless from 2000 to December 2010, including as SVP and CTO from 2007 to December 2010. Mr. Melone serves on the board of directors of ADTRAN, Inc., a public company.

68.     According to the 2020 Proxy Statement, Defendant Melone was the beneficial owner of 15,744 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Melone owned approximately $2.15 million worth of Company stock.

69.     Defendant Melone received $259,346 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $85,000 in fees earned or paid in cash, $154,952 in stock awards, and $19,394 in all other compensation.

70.     Defendant Melone received $287,762 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $95,000 in fees earned or paid in cash, $179,995 in stock awards, and $12,767 in all other compensation.

*Defendant Moreland*

71.     Defendant W. Benjamin Moreland ("Moreland") is a Company director, and has served in that capacity since August 2006. He previously served as Executive Vice President and CFO between February 2004 and June 2008, as President and CEO between July 2008 and June 2016, and as Executive Vice Chairman between June 2016 and December 2017. He also serves as a member of the Strategy Committee. The 2020 Proxy Statement described Defendant Moreland as follows:

> Mr. Moreland was appointed to the Board as a director in August 2006 and served as our EVC from June 2016 to December 2017. Prior to his appointment as EVC, he served as our President and CEO from July 2008 and as our EVP and CFO from February 2004 to June 2008, having been appointed CFO and Treasurer in April 2000. Prior to being appointed CFO, he had served as our SVP and Treasurer, including with respect to our domestic subsidiaries, since October 1999. Mr. Moreland serves as the chairman on the board of directors of Clear Channel Outdoor Holdings, Inc., a public company, and as a director on the board of directors of Houston Methodist Hospital. From May 2016 to September 2017, Mr. Moreland served on the board of directors of Monogram Residential Trust, Inc., which was a public company until its acquisition by an affiliate of Greystar Growth and Income Fund, LP in September 2017. From January 2008 to March 2018, Mr. Moreland served on the board of directors of Calpine Corp., which was a public company until its acquisition by an affiliate of Energy Capital Partners.

72.     According to the 2020 Proxy Statement, Defendant Moreland was the beneficial owner of 719,376 shares of the Company's common stock as of March 27, 2020. As the price of the Company's stock was $136.89 per share at close on March 27, 2020, Defendant Moreland owned over $98.4 million worth of Company stock.

73.     Defendant Moreland received $252,339 in compensation from the Company during the fiscal year ended December 31, 2018, which consisted of $75,000 in fees earned or paid in cash, $154,952 in stock awards, and $22,387 in all other compensation.

74.     Defendant Moreland received $286,540 in compensation from the Company during the fiscal year ended December 31, 2019, which consisted of $85,000 in fees earned or paid in cash, $179,995 in stock awards, and $21,545 in all other compensation.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

75.     Based out of Houston, Texas, Crown Castle is the largest provider of shared communications infrastructure in the United States. The Company is structured as an REIT, and owns, operates, and leases infrastructure such as cell towers and fiber assets.

76.     Crown Castle's assets are divided between its Towers segment and its Fiber segment, which manage roughly 40,000 cell towers and 65,000 miles of fiber optic cable, respectively. The Towers segment generates the majority of the Company's revenue, which includes the Company's cell tower installation services revenue.

77.     Beginning at least in February 2018, the Individual Defendants caused the Company to record as revenue the full transaction price from the Company's cell tower installation services upon the completion of service. However, portions of the transaction price of these services constituted modifications to leases related to the installation services. As such, those portions of the revenue should have been recorded on a ratable basis in the Company's financial statements, and recognized cumulatively over the term of the lease contracts.

78.     As a result of this revenue recognition practice, the adjusted EBITDA, adjusted funds from operations, and net income figures contained in the Company's financial statements issued between February 2018 and November 2019, at least, were each inflated by at least $100 million during the Relevant Period, in violation of GAAP.

79.     On October 16, 2019, the Company issued a press release revealing that in September 2019, the Company had received a subpoena from the SEC requesting documents

"primarily related to the Company's long-standing capitalization and expense policies for tenant upgrades and installations in its services business."

80.     Subsequently, representatives of the Company and the Company's independent auditor conferred with the OCA regarding the Company's revenue recognition practices. The Company and the OCA ultimately determined that the Company's revenue recognition practices with respect to services revenues violated GAAP. This also indicated the existence of a material weakness in the Company's internal controls over financial reporting.

## Materially False and Misleading Statements

### February 26, 2018 Form 10-K

81.     The Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2017 with the SEC on February 26, 2018 (the "2017 10-K"), which was signed by Defendants Brown, Schlanger, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland.

82.     The 2017 10-K reported, *inter alia*, adjusted EBITDA of $2,481,761,000 and $444,550,000 in net income for the fiscal year ended December 31, 2017.

83.     The 2017 10-K stated the following regarding the Company's disclosure controls and procedures and internal controls:

> In connection with the preparation of this Annual Report on Form 10-K, as of December 31, 2017, the Company's management conducted an evaluation, under the supervision and with the participation of the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act")). **Based upon their evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures, as of December 31, 2017, were effective** to provide reasonable assurance that information required to be disclosed by the Company in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and to provide reasonable assurance that information required to

21

be disclosed by the Company in such reports is accumulated and communicated to the Company's management, including its CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.

* * *

Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for the Company. Under the supervision and with the participation of the Company's CEO and CFO, management assessed the effectiveness of the Company's internal control over financial reporting based on the framework described in *"Internal Control – Integrated Framework (2013),"* issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.***

* * *

Management has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2017. ***Based on the Company's assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2017 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.***

* * *

***There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.***

(Emphasis added.)

84.     The 2017 10-K also contained certifications signed by Defendants Brown and Schlanger pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") affirming the accuracy of the financial statements contained in the 2017 10-K, and attesting to the disclosure of any fraud committed by Crown Castle, its officers, or its directors and the disclosure of any material changes to Crown Castle's internal controls.

22

*April 2, 2018 Proxy Statement*

85.     The Company filed a Schedule 14A with the SEC on April 2, 2018 (the "2018 Proxy Statement"). Defendants Brown, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland solicited the 2018 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act, and which contained material misstatements and omissions.[1]

86.     Regarding the Company's Proper Business Practices and Ethics Policy (the "Ethics Policy"), and the Company's Financial Code of Ethics, which govern the conduct of the Company's officers and directors, and which are described in greater detail below, the 2018 Proxy Statement provided as follows:

> Copies of the Committee charters of each of the Audit Committee, Compensation Committee and the NCG Committee, together with certain other corporate governance materials, including our Financial Code of Ethics, Corporate Governance Guidelines and Business Practices and Ethics Policy, can be found under the Investors section of our website.

87.     The 2018 Proxy Statement was false and misleading because the Individual Defendants did not follow the Company's Ethics Policy or its Financial Code of Ethics, as indicated by the numerous false and misleading statements described herein, as well as by the Individual Defendants' failures to report violations of the Ethics Policy or the Financial Code of Ethics.

---

[1] Plaintiff's allegations regarding the misleading statements and omissions in the 2018 Proxy Statement are solely based on negligence; Plaintiff's allegations are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with respect to these allegations and related claims.

88. The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain revenue pertaining to its cell tower installation services in its financial statements; (2) as such, the Company's financial statements filed with the SEC were not prepared in accordance with GAAP; (3) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (4) the Company failed to maintain effective disclosure controls and procedures and internal controls over financial reporting; (5) as a result of the foregoing, the Company would be subjected to an SEC investigation, and would ultimately be forced to restate its annual reports for the fiscal years ended December 31, 2018 and December 31, 2017, as well as each of its periodic reports issued during 2018 and 2019; and (6) due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 4, 2018 Form 10-Q

89. The Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2018 with the SEC on May 4, 2018 (the "1Q18 10-Q"), which was signed by Defendant Schlanger,

90. The 1Q18 10-Q also contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure of any fraud committed by the Company, its officers, or its directors, and the disclosure of any material changes to the Company's internal controls.

91. The 1Q18 10-Q reported, *inter alia*, adjusted EBITDA of $763,000,000 and $114,000,000 in net income (loss) for the fiscal quarter ended March 31, 2018.

92. The 1Q18 10-Q also stated the following regarding the Company's disclosure controls and procedures and internal controls:

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

\* \* \*

***There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting***.

(Emphasis added.)

93.     The 1Q18 10-Q also contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure of any fraud committed by the Company, its officers, or its directors, and the disclosure of any material changes to the Company's internal controls.

### *August 6, 2018 Form 10-Q*

94.     The Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2018 with the SEC on August 6, 2018 (the "2Q18 10-Q"), which was signed by Defendant Schlanger.

95.     The 2Q18 10-Q stated the following regarding the Company's net income and adjusted EBITDA:

Net income (loss) attributable to CCIC stockholders was income of $180 million during  the second quarter  of 2018 compared  to  income  of $112 million during  the second quarter  of 2017. ***The increase was predominately related to net growth in our Towers and Fiber segments***, including as a result of the Wilcon Acquisition and Lightower Acquisition as discussed above, partially offset by an increase in expenses, including increases in (1) interest expense and amortization of deferred financing costs, (2) depreciation, amortization, and accretion, and (3) general and administrative expenses.

Adjusted EBITDA increased $180 million, or 31%, from the second quarter of 2017 to the second quarter of 2018. ***Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments***, including the Wilcon Acquisition and Lightower Acquisition.

(Emphasis added.)

96.     The 2Q18 10-Q stated the following regarding the Company's disclosure controls and procedures and internal controls:

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

\* \* \*

***There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.***

(Emphasis added.)

97.     The 2Q18 10-Q also contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure of any fraud committed by the Company, its officers, or its directors, and the disclosure of any material changes to the Company's internal controls.

***November 5, 2018 Form 10-Q***

98.     The Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2018 with the SEC on November 5, 2018 (the "3Q18 10-Q"), which was signed by Defendant Schlanger.

26

99.     The 3Q18 10-Q stated the following regarding the Company's net income and

adjusted EBITDA:

> Net income (loss) attributable to CCIC stockholders was income of $164 million
> during the third quarter of 2018 compared to income of $115 million during
> the third quarter of 2017. ***The increase was predominately related to net growth in
> our Towers and Fiber segments***, including as a result of the Lightower Acquisition
> as discussed above, partially offset by an increase in expenses, including increases
> in (1) depreciation, amortization, and accretion, (2)selling, general and
> administrative expenses and (3) losses on retirement of long-term obligations.
>
> Adjusted EBITDA increased $188 million, or 31%, from the third quarter
> of 2017 to the third quarter of 2018. ***Adjusted EBITDA was positively impacted by
> the growth in our site rental activities in both the Towers and Fiber segments***,
> including the Lightower Acquisition.

(Emphasis added.)

100.    The 3Q18 10-Q stated the following regarding the Company's disclosure controls

and procedures and internal controls:

> The Company conducted an evaluation, under the supervision and with the
> participation of the Company's management, including the Company's Chief
> Executive Officer and Chief Financial Officer, of the effectiveness of the
> Company's disclosure controls and procedures as of the end of the period covered
> by this report. ***Based on this evaluation, the Chief Executive Officer and Chief
> Financial Officer concluded that the Company's disclosure controls and
> procedures were effective*** in alerting them in a timely manner to material
> information relating to the Company required to be included in the Company's
> periodic reports under the Securities Exchange Act of 1934, as amended.
>
>                          * * *
>
> ***There have been no changes in the Company's internal control over financial
> reporting during the fiscal quarter covered by this report that have materially
> affected, or are reasonably likely to materially affect, the Company's internal
> control over financial reporting.***

(Emphasis added.)

101.    The 3Q18 10-Q also contained SOX certifications signed by Defendants Brown

and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure

of any fraud committed by the Company, its officers, or its directors, and the disclosure of any material changes to the Company's internal controls.

### *February 25, 2019 Form 10-K*

102.    The Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2018 with the SEC on February 25, 2019 (the "2018 10-K"), which was was signed by Defendants Brown, Schlanger, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland.

103.    The 2018 10-K reported, *inter alia*, adjusted EBITDA of $3,141,000,000 and $671,000,000 in net income for the fiscal year ended December 31, 2018.

104.    The 2018 10-K stated the following regarding the Company's disclosure controls and procedures and internal controls:

> In connection with the preparation of this Annual Report on Form 10-K, as of December 31, 2018, the Company's management conducted an evaluation, under the supervision and with the participation of the Company's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934 ("Exchange Act")). ***Based upon their evaluation, the CEO and CFO concluded that the Company's disclosure controls and procedures, as of December 31, 2018, were effective*** to provide reasonable assurance that information required to be disclosed by the Company in the reports filed or submitted by it under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms, and to provide reasonable assurance that information required to be disclosed by the Company in such reports is accumulated and communicated to the Company's management, including its CEO and CFO, as appropriate to allow timely decisions regarding required disclosure.
>
> * * *
>
> Management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for the Company. Under the supervision and with the participation of the Company's CEO and CFO, management assessed the effectiveness of the Company's internal control over financial reporting based on the framework described in *"Internal Control – Integrated Framework (2013),"* issued by the Committee of Sponsoring Organizations of the Treadway

Commission. ***The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles.***

* * *

Management has assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2018. ***Based on the Company's assessment, management has concluded that the Company's internal control over financial reporting was effective as of December 31, 2018 to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. generally accepted accounting principles.***

* * *

***There have not been any changes in the Company's internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) during the most recent fiscal quarter that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting.***

(Emphasis added.)

105.    The 2018 10-K also contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure of any fraud committed by the Company, its officers, or its directors, and the disclosure of any material changes to the Company's internal controls.

***April 1, 2019 Proxy Statement***

106.    The Company filed a Schedule 14A with the SEC on April 1, 2019 (the "2019 Proxy Statement"). Defendants Brown, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland solicited the 2019 Proxy Statement, which was filed pursuant to Section 14(a) of the Exchange Act, and which contained material misstatements and omissions.[2]

---

[2] Plaintiff's allegations regarding the misleading statements and omissions in the 2019 Proxy

107.    Regarding the Company's Ethics Policy and Financial Code of Ethics, the 2019 Proxy Statement provided as follows:

> Copies of the Committee charters of each of the Audit Committee, Compensation Committee and the NCG Committee, together with certain other corporate governance materials, including our Financial Code of Ethics, Corporate Governance Guidelines and Business Practices and Ethics Policy, can be found under the Investors section of our website.

108.    The 2019 Proxy Statement was false and misleading because the Individual Defendants did not follow the Company's Ethics Policy or its Financial Code of Ethics, as indicated by the numerous false and misleading statements described herein, as well as by the Individual Defendants' failures to report violations of the Ethics Policy or the Financial Code of Ethics.

109.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain revenue pertaining to its cell tower installation services in its financial statements; (2) as such, the Company's financial statements filed with the SEC were not prepared in accordance with GAAP; (3) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (4) the Company failed to maintain effective disclosure controls and procedures and internal controls over financial reporting; (5) as a result of the foregoing, the Company would be subjected to an SEC investigation, and would ultimately be forced to restate its annual reports for the fiscal years ended December 31, 2018 and December 31, 2017, as well as each of its periodic reports issued during 2018 and 2019; and (6) due to the

---

Statement are solely based on negligence; Plaintiff's allegations are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with respect to these allegations and related claims.

foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 3, 2019 Form 10-Q

110. The Company filed its quarterly report on Form 10-Q for the fiscal quarter ended March 31, 2019 with the SEC on May 3, 2019 (the "1Q19 10-Q"), which was signed by Defendant Schlanger.

111. The 1Q19 10-Q stated the following regarding the Company's net income and adjusted EBITDA:

> Net income (loss) attributable to CCIC stockholders was income of $210 million during the first quarter of 2019 compared to income of $114 million during the first quarter of 2018. ***The increase was predominately related to net growth in our Towers and Fiber segments*** and a decrease in losses on retirement of long-term obligations, partially offset by an increase in expenses, including increases in depreciation, amortization, and accretion and selling, general and administrative expenses.
>
> Adjusted EBITDA increased $58 million, or 8%, from the first quarter of 2018 to the first quarter of 2019. ***Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments***.

(Emphasis added.)

112. The 1Q19 10-Q stated the following regarding the Company's disclosure controls and procedures and internal controls:

> The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

* * *

> ***There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.*** We have updated our existing information technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019.

(Emphasis added.)

113.     The 1Q19 10-Q also contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure of any fraud committed by the Company, its officers, or its directors, and the disclosure of any material changes to the Company's internal controls.

### *July 31, 2019 Form 10-Q*

114.     The Company filed its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2019 with the SEC on July 31, 2019 (the "2Q19 10-Q"), which was signed by Defendant Schlanger.

115.     The 2Q19 10-Q stated the following regarding the Company's net income and adjusted EBITDA:

> Net income (loss) attributable to CCIC stockholders was income of $246 million during the second quarter of 2019 compared to income of $180 million during the second quarter of 2018. ***The increase was predominately related to net growth in our Towers and Fiber segments***, partially offset by an increase in expenses, including increases in (1) selling, general and administrative expenses, (2) depreciation, amortization and accretion, and (3) interest expense and amortization of deferred financing costs.

> Adjusted EBITDA increased $88 million, or 11%, from the second quarter of 2018 to the second quarter of 2019. ***Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments***.

(Emphasis added.)

116.     The 2Q19 10-Q stated the following regarding the Company's disclosure controls and procedures and internal controls:

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

* * *

***There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.*** We have updated our existing information technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019.

(Emphasis added.)

117.    The 2Q19 10-Q also contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure of any fraud committed by the Company, its officers, or its directors, and the disclosure of any material changes to the Company's internal controls.

### October 16, 2019 Press Release

118.    The Company issued a press release on October 16, 2019 disclosing the Company's financial results for the fiscal quarter ended September 30, 2019.

119.    The press release reported, *inter alia*, $1,128,000,000 in net income, $3,592,000,000 in adjusted EBITDA, $5,219,000,000 in site rental revenues, and $2,685,000,000 in adjusted funds from operations.

### October 16, 2019 Supplemental Information Package and Non-GAAP Reconciliations

120.    Additionally, on October 16, 2019, the Company filed with the SEC a current report on Form 8-K, which included as an exhibit a "Supplemental Information Package and Non-GAAP

Reconciliations" for the fiscal quarter ended September 30, 2019 (the "3Q19 Information Package").

121.    The 3Q19 Information Package reported, *inter alia*, $646,000,000 in adjusted funds from operations for the fiscal quarter ended September 30, 2019, as well as $1,871,000,000 in adjusted funds from operations for the nine-month period ended September 30, 2019.

122.    The 3Q19 Information Package also reported, *inter alia*, $579,000,000 in adjusted funds from operations for the fiscal quarter ended September 30, 2018, as well as $1,683,000,000 in adjusted funds from operations for the nine-month period ended September 30, 2018.

### *November 4, 2019 Form 10-Q*

123.    The Company filed its quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2019 with the SEC on November 4, 2019 (the "3Q19 10-Q"), which was signed by Defendant Schlanger.

124.    The 3Q19 10-Q stated the following regarding the Company's net income and adjusted EBITDA:

> Net income attributable to CCIC stockholders was $244 million during the third quarter of 2019 compared to $136 million during the third quarter of 2018. ***The increase was predominately related to net growth in our Towers and Fiber segments*** and a decrease in losses on retirement of long-term obligations, partially offset by an increase in interest expense and amortization of deferred financing costs.
>
> Adjusted EBITDA increased $89 million, or 11%, from the third quarter of 2018 to the third quarter of 2019. ***Adjusted EBITDA was positively impacted by the growth in our site rental activities in both the Towers and Fiber segments***.

(Emphasis added.)

125.    The 3Q19 10-Q stated the following regarding the Company's disclosure controls and procedures and internal controls:

The Company conducted an evaluation, under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report. ***Based on this evaluation, the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective*** in alerting them in a timely manner to material information relating to the Company required to be included in the Company's periodic reports under the Securities Exchange Act of 1934, as amended.

* * *

***There have been no changes in the Company's internal control over financial reporting during the fiscal quarter covered by this report that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting***. We have updated our existing information technology systems, review processes, and internal controls to align with the requirements of the new lease standard, which we adopted on January 1, 2019.

(Emphasis added.)

126.    The 3Q19 10-Q also contained SOX certifications signed by Defendants Brown and Schlanger attesting to the accuracy of the financial statements contained therein, the disclosure of any fraud committed by the Company, its officers, or its directors, and the disclosure of any material changes to the Company's internal controls.

127.    The statements referenced in ¶¶ 81–84, 89–105, and 110–126 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain revenue pertaining to its cell tower installation services in its financial statements; (2) as such, the Company's financial statements filed with the SEC were not prepared in accordance with GAAP; (3) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (4) the Company failed to maintain effective disclosure controls and procedures and internal controls over financial reporting; (5) as a result of the foregoing, the Company would be subjected to an

SEC investigation, and would ultimately be forced to restate its annual reports for the fiscal years ended December 31, 2018 and December 31, 2017, as well as each of its periodic reports issued during 2018 and 2019; and (6) due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

***February 26, 2020 Press Release***

128.    The Company issued a press release on February 26, 2020 revealing to the public that the Company, after consulting with the OCA, had concluded that certain of the Company's "long-standing" revenue recognition practices were unacceptable under GAAP. As such, the Company would be forced to restate the financial statements contained in its annual reports for the fiscal years ended December 31, 2018 and December 31, 2017, as well as the quarterly financial statements contained in the Company's periodic reports issued during 2018 and 2019. The press release stated the following:

> Our long-standing historical practice with respect to services revenues had been to recognize the entirety of the transaction price from our tower installation services as services revenues upon the completion of the installation services. ***After consultation with the OCA, we concluded that our historical practice was not acceptable under GAAP***. Instead, a portion of the transaction price for our installation services, specifically the amounts associated with permanent improvements recorded as fixed assets, represents a modification to the leases to which the services work is related and, therefore, should be recognized on a ratable basis as site rental revenues over the associated estimated remaining lease term.  Cumulatively, over the term of customer lease contracts, we will recognize the same amount of total revenue and total gross margin as our historical practice.

> The result of recognizing a portion of the transaction price on a ratable basis will be an increase to site rental revenues and site rental gross margins that offsets, over time, the decreases to services revenues and services gross margins, in both historical and future periods. ***As a result, the preliminary impact to each of Net Income, Adjusted EBITDA and AFFO is a decrease of approximately $100 million for full year 2019 actuals and a decrease of approximately $90 million to our Previous 2020 Outlook***.  We have provided tables in this release to reconcile the changes.  Recognizing a portion of the transaction price on a ratable basis for

tower installation services will have no impact on our net cash flows, business operations or expected dividend per share growth.

***Due to the identified errors described above, we will restate our financial statements for the years ended December 31, 2018 and 2017, and unaudited financial information for the quarterly and year-to-date periods in the year ended December 31, 2018 and for the first three quarters in the year ended December 31, 2019***.  Restated financial statements and financial information for the periods in question will be reflected in Crown Castle's Annual Report on Form 10-K for the year ended December 31, 2019 ("2019 10-K"), which Crown Castle expects to file within the prescribed timeline for such report, including any available extension if needed to finalize the consolidated financial statements and disclosures and complete the associated audit work.

* * *

***Crown Castle has determined that the restatement of its previously issued financial statements as described above indicates the existence of one or more material weaknesses in its internal control over financial reporting and that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2019***.  Crown Castle will report the material weakness(es) in its 2019 10-K and intends to create a plan of remediation to address the material weakness(es).

(Emphasis added.)

129.    On this news, the price of the Company's stock dropped precipitously, falling from $162.69 per share at the close of trading on February 26, 2020, to $148.40 per share at the close of trading on February 27, 2020, representing a loss in value of over 8.8%.

130.    Subsequently, on March 2, 2020, the Company notified the SEC that as a result of the material weakness in the Company's internal controls, the Company would be unable to timely file its 2019 10-K. The Company indicated that it expected to file the 2019 10-K "within the fifteen day extension period" allotted to rectify late filings under SEC rules.

### THE COMPANY'S ETHICS POLICY AND FINANCIAL CODE OF ETHICS

131.    Crown Castle's Ethics Policy states that "[t]he Policy applies to all employees of Crown Castle throughout the world," and that "Crown Castle employees are responsible for

reading, understanding and complying with the Policy. Each employee should make a commitment to strive to conduct Crown Castle's business with integrity and in compliance with the Policy."

132.    In a section titled, "Compliance with Laws and Regulations (including Insider Trading Laws), the Ethics Policy provides as follows:

> Obeying the law both in letter and in spirit is the foundation upon which Crown Castle's ethical standards are built. ***An employee should endeavor to comply with the laws and regulations applicable to Crown Castle's business***. Although an employee is not expected to know every law and regulation that is applicable to Crown Castle, it is important that employees know enough to ask questions and seek advice from supervisors, managers, lawyers or other appropriate personnel if he or she has any doubt regarding the legality of an action taken, or not taken, on behalf of Crown Castle.
>
> ***In general, purchasing or selling securities of Crown Castle, either directly or indirectly, while in possession of material non-public information is both unethical and illegal***. An employee may not disclose material non-public information to others who might use such information to directly or indirectly place trades in Crown Castle securities. An employee should read and comply with Crown Castle's Policy Statement on Insider Trading.
>
> Pursuant to Section 16 of the Securities Exchange Act of 1934, substantially all purchases or sales of securities of Crown Castle by directors, executive officers, and 10% stockholders should be disclosed within two business days of the transaction. Each officer, director and stockholder who is subject to these reporting procedures should comply with such laws and regulations and the applicable provisions of Crown Castle's Policy Statement on Insider Trading.
>
> ***Crown Castle endeavors to provide full, accurate, timely and understandable disclosure in all public communications and reports and documents that Crown Castle files with the SEC.***

(Emphasis added.)

133.    In a section titled, "Books and Records," the Ethics Policy provides as follows:

> ***Crown Castle's books, records and accounts should accurately and fairly reflect the transactions of Crown Castle in reasonable detail and in accordance with Crown Castle's accounting practices and policies, including generally accepted accounting principles and Crown Castle's system of internal controls, as applicable***. The following examples are given for purposes of illustration and are not intended to limit the generality of the foregoing in any way:

- No false, misleading or deliberately inaccurate books, records, accounts or entries should be made or caused to be made.
- No payment should be made with the intention or understanding that all or any part of it is to be used for any purpose other than that described by the documents supporting the payment.
- No undisclosed, unrecorded or "off-book" funds or assets should be established.
- No false or misleading statements (or omissions), written or oral, should be intentionally made to any internal or external accountant or auditor with respect to Crown Castle's financial statements or documents to be filed with the U.S. Securities and Exchange Commission ("SEC") or other governmental authority.
- No action to fraudulently influence, coerce, manipulate or mislead Crown Castle's internal or independent auditors should be made or taken.

An employee should exercise due diligence in order to comply with the standards described above. If an employee believes that Crown Castle's books and records are not being maintained in accordance with these requirements, the employee should report the matter pursuant to the reporting procedures described below.

(Emphasis added.)

134.    In a section titled, "Fair Dealing," the Ethics Policy provides as follows:

*In connection with Crown Castle's business, each employee should endeavor to deal fairly with other employees and third parties.* Customers and suppliers should be dealt with at arm's length and have fair opportunities to compete for Crown Castle's business. *In furtherance of fair competition, an employee should seek to avoid actions that are in violation of laws and regulations governing competitive practices in the marketplace.*

(Emphasis added.)

135.    In a section titled, "Questionable or Improper Payments or Use of Crown Castle's

Assets," the Ethics Policy provides as follows:

*An employee should seek to protect Crown Castle's assets and ensure their efficient use.* Theft, carelessness and waste have a direct impact on Crown Castle's profitability. The use of Crown Castle funds or assets for any unlawful or improper purpose is not permitted. Further, no payment on behalf of Crown Castle may be made or approved with the intention or understanding that any part of such payment is to be used for any unlawful purpose.

Crown Castle's assets should be used for legitimate business purposes and are not maintained for use by an employee for non-business related purposes. An

employee's occasional personal use of items such as stationery, supplies, copying facilities or telephone, when the cost to Crown Castle is insignificant, is permissible. Each employee should consult and abide by Crown Castle's other policies and guidelines relating to the use of specific assets, such as Crown Castle's email system and automobiles.

(Emphasis added.)

136.    Crown Castle also maintains a Financial Code of Ethics, which purports that it applies to the Company's CEO and CFO, among other executive officers. The Financial Code of Ethics states that the Company's senior officers must conduct themselves in accordance with the following principles:

- act ethically with honesty and integrity, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- provide full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the United States Securities and Exchange Commission ("SEC") and in other public communications that the Company makes;
- comply with applicable laws, rules and regulations of national, state, provincial and local governments and private and public regulatory agencies (including the New York Stock Exchange ("NYSE")) having jurisdiction over the Company;
- act in good faith, responsibly, with due care, competence and diligence, without misrepresenting material facts or allowing his or her independent judgment on behalf of the Company to be subordinated to other interests;
- promote honest and ethical behavior by others in the work environment;
- respect the confidentiality of information acquired in the course of his or her work except when authorized or otherwise legally obligated to disclose such information;
- responsibly use and maintain all assets and resources employed or entrusted to such Senior Officer;
- promptly report material violations of this Financial Code pursuant to the "Compliance Procedures" below; and
- accept accountability for adherence to this Financial Code.

137.    In violation of the Ethics Policy, and the Financial Code of Ethics with respect to Defendants Brown and Schlanger, the Individual Defendants conducted little to no oversight of the scheme to issue materially false and misleading statements to the public and to facilitate and

disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of Section 14(a) of the Exchange Act. Additionally, Defendant Garrison violated the Ethics Policy by engaging in insider trading. Also in violation of the Ethics Policy, and the Financial Code of Ethics with respect to Defendants Brown and Schlanger, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## THE COMPANY'S AUDIT COMMITTEE CHARTER

138.    The Company's Audit Committee Charter states the following with respect to the duties of the Company's Audit Committee:

> The Audit Committee ("Committee") is established by the Board of Directors ("Board") of Crown Castle International Corp. ("Company") to assist the Board in its fiduciary responsibilities to the Company's stockholders ("Stockholders"). The Committee's function is an oversight role relating to the Company's financial statements and accounting practices. In particular, the purpose of the Committee is to serve as an independent and objective party to:
>
> - oversee the quality and integrity of the financial statements and other financial information the Company provides to any governmental body or the public;
>
> - oversee the Company's compliance with legal and regulatory requirements;
>
> - oversee the qualifications and independence of the Company's independent external auditors ("Auditors");
>
> - oversee the performance of the Company's internal audit function and the Auditors; and
>
> - oversee the Company's systems of internal controls regarding finance, accounting, legal compliance and ethics.

139.    Defendants Bartolo, Garrison, Hogan, and McKenzie, who served as members of the Audit Committee during the Relevant Period, violated the Audit Committee Charter by failing to ensure the integrity of the Company's financial statements and internal controls, and by failing

to ensure the Company's compliance with applicable regulatory requirements, allowing the Company to issue false and misleading financial statements with the SEC.

## DAMAGES TO CROWN CASTLE

140.    Due to the Individual Defendants' misconduct, Crown Castle will lose and expend many millions of dollars.

141.    These expenditures include any fees incurred in connection with the SEC investigation into the Company, legal fees incurred in connection with the Securities Class Actions filed against the Company and the Company's CEO and CFO, and any internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

142.    These expenditures also include compensation, benefits, and other payments provided to the Individual Defendants which was excessive in light of the Individual Defendants' breaches of fiduciary duties to the Company and other misconduct.

143.    As a direct result of the Individual Defendants' misconduct, the Company has suffered and will continue to suffer a loss of reputation and goodwill, as well as a "liar's discount" that will negatively impact the Company's stock in the future due to the Individual Defendants' misrepresentations and their breaches of fiduciary duties.

## DERIVATIVE ALLEGATIONS

144.    Plaintiff brings this action derivatively and for the benefit of the Company to redress injuries suffered, and to be suffered due to the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Crown Castle and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

145.    Crown Castle is solely named as a nominal party in this derivative action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146.    Plaintiff is, a shareholder of Crown Castle, and has been a shareholder at all relevant times. Plaintiff will fairly and adequately represent the interests of the Company in prosecuting and enforcing the Company's rights, and in furtherance of that end, Plaintiff has retained counsel experienced in derivative litigation to enforce and prosecute this action.

**DEMAND FUTILITY ALLEGATIONS**

147.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

148.    A pre-suit demand on the Board of Crown Castle is futile, and thus, excused. As of the date of the filing of this action, the Company's Board consists of the following twelve Individual Defendants: Defendants Brown, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland (together, the "Directors"). Plaintiff needs only to allege demand futility as to six out of the twelve Directors on the Company's Board at the time this action is commenced.

149.    Demand is excused as to all twelve Directors, because each one of them faces a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to engage in improper accounting practices and to make and/or cause the Company to make false and misleading statements and omissions of material facts, while Defendant Garrison  engaged in insider sales based on material non-public information, netting proceeds of approximately $279,311, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

150.    In abdication of their fiduciary duties to Crown Castle, the Directors knowingly or recklessly caused the Company to engage in improper accounting practices and made and/or

caused the Company to make the false and misleading statements and omissions of material fact described herein. Additionally, the Directors failed to maintain internal controls, and caused the Company to fail to timely file its 2019 10-K This scheme was, *inter alia,* designed to make the Company appear more profitable than it actually was, and thus more attractive to investors. Due to the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is therefore excused as being futile.

151.   Specific reasons why demand on each Director is futile are as follows:

***Defendant Brown***

152.   Defendant Brown is the Company's current CEO and President, and has served in those roles since June 2016. Between July 2008 and May 2016, he served as the Company's Senior Vice President, CFO, and Treasurer. As the Company admits, Defendant Brown is a non-independent director. The Company provides Defendant Brown with his principal occupation, and he received $9,025,526 in compensation from the Company during the 2018 fiscal year, as well as $12,620,843 in compensation during the 2019 fiscal year.

153.    Defendant Brown was responsible for all of the materially false and misleading statements and omissions described herein, including those contained in the Company's SEC filings and press releases. As the Company's CEO and as a trusted Company director, Defendant Brown conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant Brown is a named defendant in the Securities Class Actions, and faces a substantial likelihood of liability in connection thereto.

154.    As such, Defendant Brown breached his fiduciary duties, is not independent or disinterested, and faces a significant likelihood of liability. Therefore, demand upon him is excused as being futile.

**Defendant Bartolo**

155.    Defendant Bartolo is a Company director, and has served in that capacity since February 2014. He also serves as the Chair of the Audit Committee, and as a member of the Compensation Committee. Defendant Bartolo has received and continues to receive compensation from the Company as described herein.

156.    As a trusted Company director, Defendant Bartolo conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant Bartolo signed off on, and therefore personally made the materially false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

157.    As such, Defendant Bartolo breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

**Defendant Christy**

158.    Defendant Christy is a Company director, and has served in that capacity since August 2007. She also serves as the Chair of the Compensation Committee, and as a member of the Nominating & Corporate Governance Committee. Defendant Christy has received and continues to receive compensation from the Company as described herein.

159.    As a trusted Company director, Defendant Christy conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. She also consciously disregarded her duties to monitor controls over reporting and engagement in the scheme, and disregarded her duties to protect the Company's assets. Additionally, Defendant Christy signed off on, and therefore personally made the materially false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

160.    As such, Defendant Christy breached her fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon her is excused as being futile.

### *Defendant Fitzgerald*

161.    Defendant Fitzgerald is a Company director, and has served in that capacity since August 2002. He also serves as the Chair of the Nominating & Corporate Governance Committee, and as a member of the Compensation Committee and the Strategy Committee. Defendant Fitzgerald has received and continues to receive compensation from the Company as described herein.

162.    As a trusted Company director, Defendant Fitzgerald conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant Fitzgerald signed off on, and therefore personally made the materially false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

163.     As such, Defendant Fitzgerald breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

**Defendant Garrison**

164.     Defendant Garrison is a Company director, and has served in that capacity since May 2005. He also serves as a member of the Compensation Committee and the Audit Committee. Defendant Garrison has received and continues to receive compensation from the Company as described herein.

165.     As a trusted Company director, Defendant Garrison conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Defendant Garrison's motive in facilitating the fraudulent scheme is further evidenced by his insider trading, which netted him at least $279,311 in proceeds. Additionally, Defendant Garrison signed off on, and therefore personally made the materially false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

166.     As such, Defendant Garrison breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

**Defendant Goldsmith**

167.     Defendant Goldsmith is a Company director, and has served in that capacity since February 2018. She also serves as a member of the Nominating & Corporate Governance

Committee and the Strategy Committee. Defendant Goldsmith has received and continues to receive compensation from the Company as described herein.

168.    As a trusted Company director, Defendant Goldsmith conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. She also consciously disregarded her duties to monitor controls over reporting and engagement in the scheme, and disregarded her duties to protect the Company's assets. Additionally, Defendant Goldsmith signed off on, and therefore personally made the materially false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

169.    As such, Defendant Goldsmith breached her fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon her is excused as being futile.

### Defendant Hogan

170.    Defendant Hogan is a Company director, and has served in that capacity since March 2001. He also serves as a member of the Audit Committee, the Compensation Committee, and the Strategy Committee. Defendant Hogan has received and continues to receive compensation from the Company as described herein.

171.    As a trusted Company director, Defendant Hogan conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant Hogan signed off on, and therefore personally made the false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

172.     As such, Defendant Hogan breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

**Defendant Hutcheson**

173.     Defendant Hutcheson is a Company director, and has served in that capacity from January 1995 until February 1999, and from July 1999 to the present. He also serves as a member of the Strategy Committee. Defendant Hutcheson has received and continues to receive compensation from the Company as described herein.

174.     As a trusted Company director, Defendant Hutcheson conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant Hutcheson signed off on, and therefore personally made the materially false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

175.     As such, Defendant Hutcheson breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

**Defendant Martin**

176.     Defendant Martin is a Company director, and has served in that capacity from 1995 until November 1998, and from November 1999 to the present. He has also served as the Chairman of the Board since May 2002. Additionally, Defendant Martin serves as a member of the

Nominating & Corporate Governance Committee. Defendant Martin has received and continues to receive compensation from the Company as described herein.

177.    As a trusted Company director, Defendant Martin conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant Martin signed off on, and therefore personally made the materially false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

178.    As such, Defendant Martin breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant McKenzie

179.    Defendant McKenzie is a Company director, and has served in that capacity since 1995. He also serves as a member of the Audit Committee and the Strategy Committee. Defendant McKenzie has received and continues to receive compensation from the Company as described herein.

180.    As a trusted Company director, Defendant McKenzie conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant McKenzie signed off on, and therefore personally made the false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

181.   As such, Defendant McKenzie breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant Melone

182.   Defendant Melone is a Company director, and has served in that capacity since May 2015. He also serves as the Chair of the Strategy Committee, and as a member of the Nominating & Corporate Governance Committee. Defendant Melone has received and continues to receive compensation from the Company as described herein.

183.   As a trusted Company director, Defendant Melone conducted little to no oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant Melone signed off on, and therefore personally made the false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

184.   As such, Defendant Melone breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Defendant Moreland

185.   Defendant Moreland is a Company director, and has served in that capacity since August 2006. He previously served as Executive Vice President and CFO between February 2004 and June 2008, as President and CEO between July 2008 and June 2016, and as Executive Vice Chairman between June 2016 and December 2017. He also serves as a member of the Strategy

Committee. Defendant Moreland has received and continues to receive compensation from the Company as described herein.

186.    As a trusted Company director, Defendant Moreland conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements. He also consciously disregarded his duties to monitor controls over reporting and engagement in the scheme, and disregarded his duties to protect the Company's assets. Additionally, Defendant Moreland signed off on, and therefore personally made the false and misleading statements contained in the Company's 2017 and 2018 10-Ks.

187.    As such, Defendant Moreland breached his fiduciary duties, is not an independent or disinterested director, and faces a substantial likelihood of liability. Therefore, demand upon him is excused as being futile.

### Additional Reasons

188.    Further reasons why demand on the Board is futile are as follows:

189.    Defendants Bartolo, Garrison, Hogan, and McKenzie (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for conducting oversight of, *inter alia*, the quality and integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and of the Company's internal controls, and they failed to ensure the Company's compliance with applicable regulatory requirements, as they are charged to do under the Audit Committee Charter, allowing the Company to file false and misleading statements with

the SEC. As such, the Audit Committee Defendants breached their fiduciary duties to the Company and are are not disinterested. Therefore, demand as to them is excused as being futile.

190.    The Directors have extensive business relationships with each other and the Individual Defendants that prevented them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Martin and Hutcheson both currently serve as Managing Directors of Platte River Equity, LLC, a private equity firm. These conflicts of interest prevented the Directors from conducting sufficient oversight over the Company's operations and internal controls, and precluded them from calling into question the Individual Defendants' misconduct. As such, demand upon the Directors is excused as futile.

191.    In violation of the Ethics Policy, and the Financial Code of Ethics with respect to Defendant Brown, the Directors conducted little to no oversight of the scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of Section 14(a) of the Exchange Act. In further violation of the Ethics Policy, and the Financial Code of Ethics with respect to Defendant Brown, the Directors failed to comply with laws and regulations, maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner. For this reason too, the Directors face a substantial likelihood of liability and demand is futile as to them.

192.    The Company has been and will continue to be exposed to substantial losses and expenditures as a result of the misconduct described herein. Yet, the Directors have not filed any lawsuits against themselves or other individuals who were responsible for this misconduct to attempt to recover for Crown Castle any part of the damages Crown Castle suffered and will continue to suffer in connection with such misconduct. Thus, demand upon the Directors is futile.

193.    The Individual Defendants' conduct described herein was based on bad faith and intentional, reckless, or disloyal misconduct, and therefore could not have been the product of legitimate business judgement. As such, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. For this reason, demand is excused as being futile.

194.    The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

195.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., funds belonging to Company shareholders. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As such, if the Directors were to sue themselves or certain of the officers of Crown Castle, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is excused as being futile.

196.     If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

197.     Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Therefore, a demand upon the Board is excused as being futile.

## FIRST CLAIM

### Against the Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

198.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

199.     The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

200.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

201.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

202.    Under the direction and watch of the Directors, the 2018 and 2019 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: that: (1) the Company improperly recognized certain revenue pertaining to its cell tower installation services in its financial statements; (2) as such, the Company's financial statements filed with the SEC were not prepared in accordance with GAAP; (3) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (4) the Company failed to maintain effective disclosure controls and procedures and internal controls over financial reporting; (5) as a result of the foregoing, the Company would be subjected to an SEC investigation, and would ultimately be forced to restate its annual reports for the fiscal years ended December 31, 2018 and December 31, 2017, as well as each of its periodic reports issued during 2018 and 2019; and (6) due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

203.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Ethics Policy and the Financial Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to issue false and misleading statements and omissions of material fact.

204.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including election of directors, appointment of an independent auditor, and an advisory vote on executive compensation.

205.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Brown, Bartolo, Christy, Fitzgerald, Garrison, Goldsmith, Hogan, Hutcheson, Martin, McKenzie, Melone, and Moreland, which allowed them to continue breaching their fiduciary duties to Crown Castle.

206.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

207.    Plaintiff on behalf of Crown Castle has no adequate remedy at law.

## SECOND CLAIM

### Against Defendants Brown and Schlanger for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

208.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.    Crown Castle, along with Defendants Brown and Schlanger are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to

Defendants Brown and Schlanger's willful and/or reckless violations of their obligations as officers and/or directors of Crown Castle.

210.    Defendants Brown and Schlanger, because of their positions of control and authority as officers and/or directors of Crown Castle, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Crown Castle, including the wrongful acts complained of herein and in the Securities Class Actions.

211.    Accordingly, Defendants Brown and Schlanger are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

212.    As such, Crown Castle is entitled to receive all appropriate contribution or indemnification from Defendants Brown and Schlanger.

## <u>THIRD CLAIM</u>

### Against the Individual Defendants for Breach of Fiduciary Duties

1.  Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

2.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Crown Castle's business and affairs.

3.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

4.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Crown Castle.

5.      In breach of their fiduciary duties owed to Crown Castle, the Individual Defendants willfully or recklessly caused the Company to engage in improper accounting practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company improperly recognized certain revenue pertaining to its cell tower installation services in its financial statements; (2) as such, the Company's financial statements filed with the SEC were not prepared in accordance with GAAP; (3) the Company's adjusted EBITDA, adjusted funds from operations, and net income were artificially inflated; (4) the Company failed to maintain effective disclosure controls and procedures and internal controls over financial reporting; (5) as a result of the foregoing, the Company would be subjected to an SEC investigation, and would ultimately be forced to restate its annual reports for the fiscal years ended December 31, 2018 and December 31, 2017, as well as each of its periodic reports issued during 2018 and 2019; and (6) due to the foregoing, the Company's public statements were materially false and misleading at all relevant times.

6.      The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, while Defendant Garrison engaged in insider trading, netting proceeds of over $279,311, which renders them personally liable to the Company for breaching their fiduciary duties.

7.      Also in breach of their fiduciary duties, the Individual Defendants failed to maintain disclosure controls and procedures and internal controls over financial reporting, and caused the Company to fail to timely file its 2019 10-K.

8.      The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the

misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Crown Castle's securities.

9.      The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Crown Castle's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

10.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

11.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Crown Castle has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

12.     Plaintiff on behalf of Crown Castle has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Crown Castle, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Crown Castle;

(c)    Determining and awarding to Crown Castle the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Crown Castle and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Crown Castle and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Crown Castle to nominate at least six candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Crown Castle restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: May 29, 2020                              Respectfully submitted,

Of Counsel:                                      **FARNAN LLP**

                                                 /s/ Michael J. Farnan
**THE BROWN LAW FIRM, P.C.**                     Brian E. Farnan (Bar No. 4089)
Timothy Brown                                    Michael J. Farnan (Bar No. 5165)
240 Townsend Square                              919 N. Market St., 12th Floor
Oyster Bay, NY 11771                             Wilmington, DE 19801
Telephone: (516) 922-5427                        Telephone: (302) 777-0300
Facsimile: (516) 344-6204                        Facsimile: (302) 777-0301
Email: tbrown@thebrownlawfirm.net                Email: bfarnan@farnanlaw.com
                                                 Email: mfarnan@farnanlaw.com

                                                 *Attorneys for Plaintiff*